The next case is United States v. Santos. Let's just wait a second and let the folks in the back rearrange. You seem to be losing your audience. Oh, he's gaining some. You're gaining some. Don't take it personally. All right, go ahead. Thank you. Good morning, Your Honors. Devin McLaughlin for Appellant Peter Santos. If I may, I would like to start with the sentencing argument because I think it has the best chance of hopefully giving him some immediate relief. As the Court is aware, under the guidelines, there is a provision that goes ahead and gives a four-point reduction if the offense involved a single instance with little or no deliberation. Here, Judge Thompson found and held that this deduction did not apply to Mr. Santos and didn't give him the benefit of it, and from our perspective, Judge Thompson was wrong. Is it a single instance making a threat, or does it have to be more than one instance of making a threat to the same person? I'm sorry. So a single instance, it's the offense of – the operative part is offense. So the offense involved a single instance. Here, the offense charge was the threat against the PO, so at least in this context, it was that single threat, which is now being construed under the guidelines. The alleged second threat was not made directly to the PO, but was made to the marshals. It was basically, from our perspective, an amplification of what he had previously said to the PO when he's asked by the marshals escorting him, you know, you need to calm down, that was dumb to say, and then he made the second comment seconds later. Why is the second comment not repetition? From our perspective, it is repetition, Your Honor. So single instance has been consistently interpreted by other circuits to be broader than single threat, and so you can have threat one, threat two, if it's in the same episode. You're saying here is somebody who got excited in a particular situation and did something. It may have been one thing or another, but it was not anything more than one instance of madness, bad behavior, whatever. Correct, correct. I mean, and the courts have been consistent in looking at this word single instance. It doesn't say single threat with little or no deliberation. It says single instance, and they interpret that as a single episode, and they look at temporal proximity, how close is all the action together, and is he talking about the same thing. And here we submit it's clear that these are obviously in temporal proximity. They're within seconds of each other, and he's talking about the same thing. In fact, he's responding to a question or comment about his prior comment. So any way you slice it from our perspective, that has to be considered a single episode. And there are multiple cases talking about time lapse. One of the cases, an hour goes between when the first statement was made and when the second statement was made. So there's no sensical way to say, well, if you say it twice, that suddenly becomes more than a single instance. I can just think if you say, you know, I'm going to hit you, and then, no, really, I mean it, I'm going to hit you. You know, the fact that you say it twice doesn't turn one instance into two instances. There's evidence that this wasn't like an impulsive thing. I mean, he had talked about it earlier. He repeated it. It didn't seem like an impulsive thing. And so it would seem that this was the enhancement would apply because it wasn't a single impulse. So from our perspective, Your Honor, that goes to the second prong, which is deliberation, focusing on whether it was a single impulse. And from our perspective, the evidence is such that there's nothing to support it other than a single impulse. In Wright-Darrisaw, thankfully, and Judge Galbraith was part of the panel, this court laid out the inquiry that we're going to have in terms of deliberation. Here, obviously, Judge Thompson misinterpreted that. He was asking, is the person under control? Is the person ranting and raving? That's not what it is. Deliberation is planning or doing something to try to carry out the threat. And here, in terms of planning, we don't have any of the indicia that you end up seeing in the other cases. I mean, that indicia goes from maybe finding the address, putting a postage stamp, doing that kind of stuff. In Russell, it's walking from Alabama to Georgia. You have some conduct that will support planning. And under Wright-Darrisaw, only if the defendant's course of conduct leading up to and following the time the threat was made is closely tied to the communication of the threat or if he made any effort to go ahead and carry it out. Here, ironically, I mean, we kind of have the perfect model or hypothetical, frankly, or exam question as far as I'm concerned because it's not like he goes to the P.O.'s office. It's not like he goes to the P.O.'s house. He's in court addressing and dealing with the court proceedings that are going to send him to additional jail time. He never addresses the P.O. at all until he is escorted out by the marshals, and then he makes the comment for which he's convicted. And then within seconds, he amplifies that comment. So the notion that there's any evidence of deliberation or planning, frankly, Your Honor, we submit that there is none. The government points to two prior statements he made to his mother in phone calls, which basically indicated he didn't like his P.O. You know, go ask yourself to the P.O. and another comment along those lines. We submit that the fact that he doesn't like his P.O., which is probably present in almost any threatening case where you don't like the person, those kind of statements are not what deliberation is intended to be under the Wright-Darrisaw case. I'm thinking of Sanders. So Sanders is the Ninth Circuit case where the gentleman went ahead and sent racist letters to certain ethnic groups. Clearly that person probably had all sorts of prior statements about his feelings vis-à-vis those ethnic groups. But the court appropriately focused on did he have to go to the post office, did he have to sit down, did he have to take time to write these, et cetera. I can't think of a more archetypal example of a single impulse of somebody having just gotten agitated with Judge Arterton, being escorted out, blurts out this one statement, and then by the time he gets to the elevator, amplifies on that statement, and I submit there is no indicia consistent with the Wright-Darrisaw analysis that we're going to find that that's deliberation. In terms of remedy, I just want to briefly touch on remedy. I mean, one of the frustrating parts about this from our perspective is that every additional day that passes is a day that he shouldn't be in jail. Here's my problem. If we agree with you that this was a single impulsive act, then we would send it back for resentencing because it is possible, we say you were wrong in taking these four into account, they shouldn't have been there, so resentence. But it has to be resentenced. Now, by the time we do that, your client is out of jail. So the effect of it would be to say he should have been in jail a few days later, sometimes later, if a new sentence is different from the old one. Let me be quite clear. I am inclined to agree with you. I was on the panel with Dennis Shaw, and I'm inclined to agree with you that this was a single impulsive act. But I have a little problem with knowing what we do about it. And, Your Honor, your collective wisdom is much broader than mine, obviously. I mean, I have seen some cases where if the panel unanimously feels consistent with where you may be inclined that this was incorrect, rather than holding it up for the decision that would explain that to the world in the future, there would be an immediate remand with instructions that, A, he should be released on appropriate conditions of release pending sentencing, B, there should be a resentencing, and C, a suggestion that the court. Well, but if the resentencing comes out with the same sentence, then what happens then? He gets put back in jail then? That's a risk he's willing to take, Your Honor. I know it's frustrating because he's within four or five months of release on the 41-month sentence, but the 21 to 27 range passed nine months ago, and so I understand the dilemma. That's why I'm asking. Thank you. You're welcome. Is he a candidate for early release, good behavior, whatever it is? When is he scheduled to be released? July is my question. So I don't have an answer to that. I know I was talking to a prosecutor earlier who works in that district and was kind enough to go ahead and talk to me about the logistics of that. I expect, and I think the government will go ahead and affirm this, insofar as he's not yet released, you know, at 36 months on a 41-month sentence, I'm expecting that his behavior in jail is probably not entitled him to, he's not even in a halfway house, which typically one would be eligible for during this time period. But again, the government may have more insight into that. Thank you. Thank you. We'll hear from the government. Good morning. May it please the Court. My name is Mark Silverman. I represent the government in this field. Starting with one particular question that came up at the end, the anticipated Bureau of Prisons release date for Mr. Santos is May 9, 2020. As counsel indicated, there may have been some behavioral problems. When I checked with the Bureau of Prisons yesterday, there were three disciplinary tickets issued, two for drug offenses and one for an assault. So to Judge Calabresi's point earlier, if you were inclined to agree that there was a single impulsive act, how that would actually work in practice, I think there's actually a risk that were this to go back to Judge Thompson, he may, out of plenary resentencing, considering all of the circumstances as the defendant stood before him, he may think a longer sentence is appropriate. Now, I don't, obviously I don't know that, but there is a risk. But they're saying that they're willing to take that risk. So, sure, that would be the risk. So let me then respond. The non-guideline range would be 21 to 27. Yes, Your Honor. So Judge Thompson could take into account the conduct in prison. Absolutely. So he may decide that a non-guideline sentence is now warranted and go upward either by departure or variance from that 21 to 27-month range. Didn't he make that decision? I'm sorry? Didn't he make that decision? Absolutely, absolutely. And if the defendant is inclined to take that risk, then I should turn to the merits of the sentencing challenge. I understand from Judge Calabresi's representation earlier, he tends to think this is a single impulse. But I wanted to respond to something. I'm just saying I'm inclined. Understood, understood, Your Honor. Counsel suggested that he couldn't think of a better example of something that would be a single impulse, and I wanted to try and meet that challenge. So if Probation Officer Topper had given his position, the Probation Officer's position at the violation hearing, just as transpired, and said, we don't think that Mr. Santos is ready to take advantage at this time of substance abuse treatment. We think he ought to be remanded. If Mr. Santos had at that moment and for the first time ever had a negative interaction and said, hey, Topper, I thought you were supposed to have my back. I'm coming for you. If he did it in that moment. Look, I don't doubt that there are things which could be even more single-minded and impulsive than this one. He was already unhappy with the Probation Officer. But what evidence is there that he would have done anything until he gets to court and Judge Arterton, who is famous for being sensitive to drug people, she set up the drug, special drug court, to his surprise says, no, you're going to jail. And at that point he explodes. Why isn't that, you know, exactly what we're talking about when we say something of this sort? Now, there may be an even more dramatic, but why isn't that enough? And essentially what we had in damage law. So it may be that the court decides our situation is close enough to that scenario and that there was some procedural error here. I understand that. I guess one thing I would say is you mentioned Judge Calabresi's surprise, but Judge Arterton had warned Mr. Santos on August 16th when she saw him for a compliance hearing that if he failed to enroll in and successfully complete an inpatient detoxification program, she was going to sentence him to six months of imprisonment followed by two additional years of supervised release. So maybe he went into the August 31st proceeding with the hope that it wouldn't turn out that way, but he certainly shouldn't have been. What are the repetitive acts in the government's view? Yes, Your Honor. So the repetitive act really has to do with the meet our maker statement. So in court, as he's being escorted out of the courtroom after Judge Arterton has left the bench, he makes his comment along the lines of, I'm coming for you, to the probation officer. He's escorted out of the courtroom, down the hallway, down another hallway to the elevator. The marshals are making efforts to talk with him, and then he says, you know, we've all got to meet our maker, whether it's by me or someone else. It may be that you decide that's all part of one episode. I understand that. But there is time that elapses, and Judge Thompson, in his role as a judge, how long it took to walk through the hallway into the elevator. Right. I'm not claiming this is hours. It could also be one minute. I mean, how long does it take to walk to an elevator? Right. Well, so the record isn't entirely clear on this issue, and if the court were to remand, I think Judge Thompson would have an opportunity to revisit his factual finding. What's the evidence of planning or some effort to carry out the threat? I mean, the following day, the only thing he ever did about the threat is to call his mother and ask her to apologize to the parole office. I don't think there's any evidence that he tried to execute the threat, that he tried to carry it out. In terms of planning, though, and whether this was a knee-jerk reaction, I guess what I would say is we have a pattern here that sets up Mr. Santos for thinking about this well in advance of August 31st. So on August 25th, he's arrested for the violation of supervisor lease, and he's brought before Magistrate Judge Richardson in the Hartford Courthouse. When that proceeding ends and he's remanded to custody, much to his chagrin, Officer Topper comes up to him, and this is all in the record of Officer Topper's testimony at the trial. Officer Topper tries to engage him in conversation, and Mr. Santos says, just give me this six months and go F yourself. And then in two recorded calls with his mother following that, he repeats that vulgarity. He uses the full vulgarity, and he says, I told my PO to go F himself, and I'm going to fight these mother F'ers until I die. Clearly he's very unhappy with the probation officer, and he knows he might be getting this six-month sentence when he shows up on August 31st. Judge Arderton has already warned him of that. But is that planning in any sort, or is that just a statement of a general background of somebody who is, I mean, obviously this is a very troubled and troubling person, but how is that, what is this there for? Is it to deal with people who have planned something, or is it there of people who have been unhappy for some time? I understand Your Honor's question. And emotional knee-jerk reactions, when there's no planning ahead of time and when there's no attempt to execute or repeat the threat afterwards, are the sort of instances that this reduction is meant for. And so if this court decides that the circumstances here are close enough to that, then it should find a procedural error and it should remand. I guess what I'm proposing to the court is that there's really two things that distinguish our circumstances here from what I would view as a prototypical threatening statement that falls under the auspices of this reduction. The first is the context beforehand. There's everything that happens on August 25th, the recorded calls on the 27th and the 29th, and then the fact that Officer Topper makes his position and the probation officer's position clear many transcript pages before Mr. Santos has his outburst. In fact, during that period of time, as Judge Thompson found, Mr. Santos is still well under control. He's making nuanced arguments with the judge. As he sees that things aren't going his way, he starts to get more agitated, and the dialogue he engages in with Judge Arnerton is more nuanced. He's still talking about the fact that this time he's not high as a kite. He's been in custody for seven days, and he'll be able to take advantage of another detox program the way he hasn't been able to on seven previous occasions. So he's still making his pitch, and he's making it in a way that's not just emotional. It's not just impulsive. He's still making an argument. Well, doesn't that just mean that when he exploded, he exploded? And that's an explosive episode, and it lasted possibly two full minutes while he's walking to the elevator. That could be, Your Honor. That's certainly one way of looking at it. But another way of thinking about it is Mr. Santos has in his head, well, if Judge Arnerton goes Officer Topper's way, that's it for me and him. That's really it. But where do we see any evidence that he has that in his head rather than, as you have described it, somebody who is being logical, is arguing, is unhappy, and so on, but is all ultimately, I mean, you almost made the argument for him by saying he was under control. Judge Calabresi, I guess what I would say is it's always difficult for the government to put on evidence of exactly what's in someone's head. It's even difficult for judges. Absolutely. But Judge Thompson, in his role as fact finder, looked at the same record and drew a factual finding. It may be one that you wouldn't have drawn yourself if you were serving in that role, but this is a clear error standard. So if it's a reasonable interpretation of the facts, it's not clearly erroneous. If someone could rationally find that that's what happened, given all of the context here, then there's no clear error with respect to the factual finding. You're arguing that he had a continuing long-term hostility to his parole officer, but the relationship is fraught. It's like a landlord-tenant, cat and dog. The relationship is set up as having an adversarial and emotional pitch to it. So the fact that he didn't like him before or uses an obscenity, I mean, I wouldn't be surprised if the obscenities are used by probation officers themselves. I understand your point, Judge Jacobson. Let me put it another way that you may know. You don't like your torts teacher because he's not a very pleasant person, and you've been in that class, and then one day he calls on you and you say something, and the teacher said, Mr. Silverman, you couldn't be longer, and at that point you explode and say something. Yes, Your Honor. I understand the point that all of you have made, and I think if you disagree which of Thompson's factual findings the appropriate remedy would be to decide there was a procedural error and to remand for a resentencing. Obviously, I would disagree that Mr. Santos should be released. I think there's a protocol in place for how that proceeds under statute, but you could direct Judge Thompson to proceed expeditiously with that resentencing. And what is the protocol that inhibits us from doing that? I don't know that there's one that would prohibit you, but there would be findings that would have to be made with respect to whether he posed a risk of flight or a danger to the community or others under the Bail Reform Act. Given the circumstances here about a threat that Officer Topper took seriously, I would think that a judge would have to make careful findings about the danger he might pose to others. Now, I guess just quickly, and I see that I've run over my time already, I understand that the court may be open to remanding for resentencing. If I could just say briefly that the government, if there were any questions with respect to the sufficiency challenge or the evidentiary challenge, I'm happy to meet them. And would ask this court to affirm the judgment. Thank you. We'll hear the rebuttal. Quickly, Your Honors, because, frankly, you've given better hypotheticals than I have and better examples than I have, so just I was... What about the clear error issue? I mean, why shouldn't we defer to Judge Thompson's factual finding that this was deliberate and repetitive? As the Second Circuit, as Your Honors have addressed, when a question is a mixed question of law and fact, if it is primarily a legal question, then we're going to use a de novo review. And here, the notion that these facts are kind of in any way, shape, or form disputed, they're not. We know what he said. We know he walked to the elevator. We know what he said then. I'm not disputing any of the judge's findings, but the judge found that he wasn't ranting and raving and that he repeated it. And so that fact pattern exists. It's a question of law whether that fits within the guideline or doesn't fit within the guideline. And trying to continually characterize it as a finding of fact, frankly, I fundamentally disagree on that. It's an application and interpretation of a guideline case. Passage of time. The passage of time, in other words, the government started with, well, Topor had testified earlier, and so there was a passage of time. That's just pure speculation as to what's going on in his mind. Did Mr. Topor testify that he took the threat seriously or that he feared for himself or his family? At trial, in terms of the offense of conviction, yes. And so it's a true threat, yes. And this sentencing argument accepts that it was a true threat. But trying to fill the right derison notion of planning into a passage of time between a reason why he would be angry and then doing something would erase any definition of planning. And finally, because, Jochen, you started with this in terms of multiple threats, the Freeman case, First Circuit, talks about a single instance connotes temporal relationship and single purpose or scheme. These are both directed towards Topor. They happen very close together. And I think more fundamentally and more fairly, his second comment was in response to somebody saying, what you just said was dumb, and then he responds to it. I can't – there's a very high interconnectedness between them. Thank you. Thank you very much. Thank you. Well argued by both sides. Thank you. Thank you.